**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**
v.
**BROWARD MARINE, Inc.,
Respondent.**
No. 15855.

United States Court of Appeals
Fifth Circuit.
April 25, 1956.

Owsley Vose, Atty., N.L.R.B., Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., David P. Findling, Associate Gen. Counsel, N.L.R.B., Washington, D. C., Theophil C. Kammholz, General Counsel, Elizabeth W. Weston, William J. Avrutis, Attorneys, National Labor Relations Board, Washington, D. C., for petitioner.

O. R. T. Bowden, Jacksonville, Fla., Hamilton & Bowden, Jacksonville, Fla., for respondent.

Before RIVES, TUTTLE and JONES, Circuit Judges.

TUTTLE, Circuit Judge.

This is a petition for enforcement of an N.L.R.B. order directing the company to rehire and pay back wages to three former employees allegedly refused reemployment because of union activities. The three employees, prominent in an unsuccessful economic strike against the company, had already been replaced in their former jobs when, along with 72 other strikers, they signed a written offer to the company to return to work unconditionally. The company allowed those who had not been replaced to return to work immediately, and advised the others to reapply. Of the thirteen who did so, none has been rehired, but the Board found discriminatory refusals to reemploy only in the cases of Arthur Roslewski, Leonard Boland and John Schepp.

The strike resulted from an impasse in bargaining negotiations between the company and Local 1535, International Association of Machinists. Prior to July, 1952, the company's employees, who then numbered about forty were unorganized. The company was primarily engaged in the maintenance, repair, and storage of pleasure boats and yachts. In that month it obtained a contract from the United States Navy to build seven nonmagnetic minesweepers, to be constructed entirely of aluminum and wood. The contract necessitated a larger work force, and by the spring of 1953, employment had reached about 300. During the latter part of this period the International Association of Machinists began organizing the company's employees, and won an N.L.R.B. election as the employees' collective bargaining agent in April, being certified on June 10, 1953. The contract negotiations which followed eventually broke down, however, and on September 1, 1953, 253 employees went out on strike.

The company advertised for replacements in newspapers as distant as Portland, Maine, and by October 19 had replaced 110 strikers. It was scrupulously fair in this, replacing those most junior in seniority and sending them notification of this fact. On October 19, 75 strikers signed a letter to the company's president, offering to return to work unconditionally. Each employee who requested work, and had not been replaced, was informed that "his card was in the rack." The others were advised to reapply by filling in an employment form with their names and addresses, such form to be attached to their previous records and "processed." Thirteen strikers did so, and were informed that they would be called back if needed. None has been recalled. The strike did not end officially then, however, but a picket line, including at various times the three strikers in question here, was maintained until January, 1954.

In its second amended charge against the employer, the union alleged unlawful discrimination against all thirteen of

the employees who made new applications and were not recalled. The complaint filed by the N.L.R.B.'s Regional Director alleged discrimination against only four of this number, however, and the Trial Examiner found the evidence of discrimination sufficient to support the charges only with regard to three. The Board affirmed, Member Rodgers dissenting on the ground that the inference of discrimination was speculative. The question for our determination is whether the findings of discrimination with regard to these three strikers are supported by substantial evidence on the record considered as a whole. 29 U.S.C.A. § 160(e).

The moving basis for the Board's inference of discrimination seems to be the fact that while the company had a need for employees throughout, as evidenced by its eventually increasing its work force to 470, it never called back the strikers who reapplied, although there was work in the yard for which they were qualified. The company's answer is that not only were Roslewski, Boland and Schepp replaced in their particular jobs, but also that no openings have occurred since October 19 in their former classifications.

Thus before the strike Boland was classified as a second-class electrician, and after he was replaced, no openings developed in this classification. Third-class electricians were hired, however. In answer to the Trial Examiner's question regarding when the company would recall replaced strikers in lower classifications, Powell, in charge of production and personnel for the company, indicated that in "practically every instance" a former employee would not be recalled in a lower classification, although he might be so notified in case of an urgent need. Powell also stated that when a new applicant for employment came in, and the possibility of a vacancy existed, the company's hiring practice was to call in the foreman of the department to interview the applicant, who would then be hired if satisfactory. This was particularly so if the applicant was highly qualified or if the time interval from the last submitted application was substantial.

In view of the fact that the three strikers in this case were admittedly qualified for openings which occurred in the yard subsequent to their reapplications, and that they picketed the main gate for a considerable time after October 19, the Trial Examiner found this explanation equivocal and unsatisfactory. Then, finding that the company was aware of these strikers' union activities, he concluded that the failure to recall them was based on a discriminatory motive.

In Roslewski's case, there was also the fact that he stopped both his old foreman and Powell on the picket line, and asked about his chances for work. The foreman indicated that he wanted Roslewski back, but eventually said that he couldn't do a thing for him, and Powell testified that he checked at the time of Roslewski's request, and found no openings in his classification. This fact is not controverted, but the Trial Examiner found that there were vacancies at that time for second and third-class welders, Roslewski being a first-class sheet-metal worker and welder.

In Schepp's case, it was shown that he, too, had asked about a job, and Powell invited him to come in for an interview. Schepp said he would, but failed to do so. This failure, the Trial Examiner found, was because he heard a rumor that Powell had said that he wasn't wanted in the yard. There is no credible evidence that Schepp even heard this rumor. In addition, the company's lawyer stated in a letter to the Board that Schepp had made threats during the strike, "which would not create a healthy condition in the yards should he be rehired."

This latter statement is admittedly the only manifestation of anti-union sentiment by the company, if it can be interpreted as such, and the Trial Examiner expressly found that the record shows no anti-union animus and no acts of interference, restraint or coercion. The inference of discrimination is based on the fact that the employer had work for

which these three strikers were qualified (although of lower classification), and yet did not recall them, a consideration which the Trial Examiner found created a *"prima facie* case of discrimination"; moreover, the *prima facie* case remained unrebutted when Powell "failed to come forward with a convincing explanation to dispel the clear inference of discrimination."

■ We think the evidence and the inference drawn from it too tenuous to support the Board's findings. There is no evidence that any of the three specifically applied for a job with a lower classification than the one previously held. The facts show no disparate treatment whatever in the handling of the applications of these three replaced strikers, when considered along with the treatment given the other ten replaced strikers who reapplied for work; none has been rehired. Of course, the company could not discriminate against all thirteen any more than it could discriminate against three, and we cannot infer a lack of discrimination from the circumstance that no complaint was filed alleging such facts. However, it does show that the so-called "prominence" of these three strikers—a much-disputed fact at the hearing had no demonstrable bearing on the company's failure to recall them, especially when is considered the fact that other, more prominent union officials are now back in the company's employ. In the absence of a pattern of coercion, or even of anti-union statements—so typical of Section 8(a)(3) cases—the Board's inference of an anti-union motive seems completely without foundation.

■ On the other question, relative to the company's inconsistent hiring policies, the Board relies on several texts in personnel management to show that it is a better policy to hire satisfactory ex-employees than to take on new men, who are bound to need orientation. This may be admitted, and still the employer cannot be found guilty of violating the Act. Whether an inference of discrimination is strong or weak is generally a question of fact, but Powell's methods, although perhaps unsystematic, do not reveal any clear-cut disparity of treatment among any of the company's former employees. If it were shown that there was a pattern of anti-union conduct on the part of the company, then such an inference might be permissible. Where no such conduct exists, however, the company cannot be found guilty of a Section 8(a)(3) violation merely on the strength of alleged unwise personnel practices.

The petition is denied.