**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**W. M. CHAMBERS TRUCK LINE, INC., Respondent.**

No. 19266.

United States Court of Appeals
Fifth Circuit.

Aug. 15, 1962.

Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Samuel M. Singer, Atty., Stuart Rothman, Gen. Counsel, Peter M. Giesey, Atty., N. L. R. B., Washington, D. C., for petitioner.

Richard C. Keenan, Kullman & Lang, New Orleans, La., for respondent.

Before TUTTLE, Chief Judge, and RIVES and BROWN, Circuit Judges.

TUTTLE, Chief Judge.

This case is before the Court on a petition of the National Labor Relations Board for enforcement of its order finding a violation by the respondent of Sections 8(a) (3) and 8(a) (1) of the National Labor Relations Act. The order of the Board required the reemployment of a driver named Pate.

It is clear that the Board was authorized to find that Pate, a relatively new employee of the company, was a leader of the effort to organize a union during the months prior to his discharge. It is also clear that this fact was known to several of the company officials, although there is no evidence that it was known personally to the Vice President in Charge of Safety and Personnel of the Company upon whose instructions he was discharged. There was evidence, however, that this official knew of the union campaign some three weeks prior to his action in discharging Pate. Two of the company's employees regularly kept other officials notified of the activities of Pate and the other employees who were interested in forming the union.

On September 10th Pate had a minor accident involving an expense of approximately $100, which he reported verbally but which he did not report in written form as required by the regulations of the company for several days. This was reported to Blalock, the Vice President in charge of Safety and Personnel by Kirkpatrick, the operations manager, and on September 22nd Kirkpatrick showed Pate a letter from Blalock, stating that Pate had been involved in four accidents since his employment had started, and that the last of these had not been reported on time, concluding that "he should be discharged for failing to report an accident timely and for accident proneness." Pate read the letter and told Kirkpatrick that he did not believe he was being discharged for the reasons given, but rather because he was a leader of the union. To this Kirkpatrick replied, "I didn't know you had a union."

Although there is no other evidence of anti-union bias on the part of the company, and although Pate's accident record while operating as a driver for an I.C.C. regulated carrier would undoubtedly be an adequate basis for discharging him if in fact that was the company's real motive in terminating his employment, the examiner found the true motive was to get rid of Pate as a leader in the union activities. These findings by the examiner were accepted in whole by the Board, which ordered that the company cease and desist from further violation of the Section 8(a) (1) and that it reinstate Pate with back pay.

The company here makes much of the point that it should not be saddled with

an accident-prone driver, and it points to its deliberate policy to cause safety determinations to be made by Vice President Blalock, who is kept entirely ignorant as to labor disputes or labor matters which might affect his judgment in determining what disciplinary measures should be meted out in the case of accidents by drivers. The examiner did not make a specific finding to the effect that the decision to discharge Pate was not made by Blalock uninfluenced by others of the company, nor did he make a finding discrediting the testimony of Blalock that he knew nothing about Pate's activities in connection with the union.

The standard to be applied by this Court in reviewing an order of the National Labor Relations Board, whether it be an order under Section 8(a) (1) or Section 8(a) (3) for the reinstatement of an employee allegedly discriminatorily discharged, has been recently considered by the Supreme Court in the two cases N. L. R. B. v. Walton Mfg. Co. et al., and N. L. R. B. v. Florida Citrus Canners Cooperative, 369 U.S. 404, 82 S. Ct. 853, 7 L.Ed.2d 829. We are mindful of the holding in those cases that, "there is no place in the statutory scheme for one test of the substantiality of evidence in reinstatement cases and another test in other cases." The Court then quotes from that part of the Universal Camera Corp. v. National Labor Relations Board opinion, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, saying, "We there said that while the 'reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view,' it may not 'displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'"

Looking first to the respondent's contention that there is absolutely no evidence of anti-union bias or feeling on the part of the employer, we find that the examiner, whose report was accepted in toto by the Board, stated: "Here, while there is no independent 8(a) (1) conduct on the part of respondent, there is plenty of evidence to dispel any indication of indifference on its part to the union campaign." The examiner, and also the Board, appear to consider that a finding that there is "no indication of indifference on [the part of the respondent] to the Union's campaign," may somehow be substituted for affirmative evidence of anti-union bias, or 8(a) (1) violation. Of course, it is clear that no independent 8(a) (1) violation need be shown to warrant a finding by the Board that there has been a discriminatory discharge under 8(a) (3) and that such discharge is itself a violation of Section 8(a) (1). This is not contested by the respondent. However, the presence or absence of an anti-union attitude by the company necessarily throws great light upon the motivation for a discharge where the company has ample grounds for discharge, but where it is contended by the Board that the discharged employee was released not for the good cause existing, but to discourage and interfere with the rights in Section 8(a) (1).

We have carefully read this record in light of the requirement that the findings of the Board are to be sustained if they are supported by substantial evidence upon the record as a whole, but we are forced to conclude that the statement of the facts as contained in the General Counsel's brief itself demonstrates that this is a case like that decided by us in N. L. R. B. v. Broward Marine, Inc., 5 Cir., 232 F.2d 451, where at page 454 we said:

"In the absence of a pattern of coercion, or even of anti-union statements—so typical of Section 8(a) (3) cases—the Board's inference of an anti-union motive seems completely without foundation."

This statement of facts made in the General Counsel's brief, which presuma-

bly is as strong a statement in support of the Board's position as can fairly be made from the evidence and the Board's findings, is as follows:

"A. EMPLOYEE PATE TAKES A LEADING ROLE IN THE UNION'S ORGANIZATION ACTIVITY

"W. W. Pate was first employed by respondent as a truck driver on January 8, 1960. He became interested in the Union [2] in July, and

"2. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, Local Union 612.

thereafter signed a union authorization card and attended two union meetings.

"The second union meeting was held at a Birmingham restaurant on Saturady night, September 17. At this meeting Pate acted as spokesman. There were 11 drivers of respondent present. Taking charge with the comment, 'let's get the show on the road and get it over with,' Pate pointed at each of those present and asked if he was for or against the Union. All of the men, except Payne, said they were for the Union. Payne indicated that he was neutral, whereupon Pate told him 'well, you can't be completely neutral, in this deal I figure you should lean one way or the other, either against it or for it.' Payne then indicated that he would go along with the crowd. Another driver, Phillips, indicated some doubt as to where he stood, but concluded that he too would 'go along with the drivers.' Pate then said, 'that's it. Nine of us are for it and two are probably for it.' At this point Payne and Phillips left the meeting. As they started out Pate said to them 'O. K. we can count on you'. Phillips turned around and said, 'yeah.' From this time until Pate's discharge on September 22 no further meetings were held; however, practically every day during the interim, Pate talked to the drivers 'trying to get them not to back out' of the Union.

"B. RESPONDENT RECEIVES REGULAR REPORTS CONCERNING THE EMPLOYEES' UNION ACTIVITIES, INCLUDING THE ACTIVITIES OF PATE.

"Company Vice President Lennox admitted at the hearing that he had instructed Kirkpatrick, the Birmingham terminal manager, to make 'frequent and periodic reports' on the Union campaign. On September 6 or 7, William Srofe, dispatcher in the terminal, overheard a telephone conversation between Lennox and Kirkpatrick in which Kirkpatrick reported that only four drivers still adhered to the Union, naming Pate and three others. On September 12 or 13, Kirkpatrick, in discussing with Lennox a September 10 traffic accident in which Pate was involved, advised Lennox against firing Pate at that time, because, as he stated, a union campaign was going on and Pate's discharge might cause some drivers to vote for the Union in a forthcoming Board election. A few days later (September 14 or 15) Kirkpatrick reported to Lennox by telephone that the drivers were planning to hold a meeting in a local restaurant on Saturday, September 17, and that drivers Phillips and Payne would report the proceedings to him on Sunday. The next Monday or Tuesday (September 19 or 20) Kirkpatrick called another of respondent's vice presidents, Knight, telling him that the identity of a 'ringleader' of the Union had been discovered and that he was 'close to the bottom of the dispatch sheet'.[3] Shortly after this call,

"3. Pate was second from the bottom on the dispatch sheet which was arranged according to seniority.

Kirkpatrick called Lennox and described the events at the drivers' meeting on the 17th. Kirkpatrick reported that Erwin and Pate 'had a

little bit too much to drink' and 'Pate took charge of the meeting.' Kirkpatrick then suggested that they proceed with the 'Pate deal' previously discussed by them.[4]

"4. The foregoing findings are based on the testimony of William Srofe, respondent's dispatcher at the Birmingham terminal who testified that he had overheard telephone conversations between Kirkpatrick and Lennox and Knight. Srofe's office adjoined Kirkpatrick's to which it was connected by a door, sometimes left open. Srofe testified that even with the door closed, he could overhear conversations carried on in a normal voice in the other office. As already noted, Lennox conceded at the hearing that he had instructed Kirkpatrick to make 'frequent and periodic reports' on the union campaign. Lennox also conceded that Kirkpatrick may have mentioned specific names in his reports (Ibid.); that Kirkpatrick did state that he hesitated invoking disciplinary action against a driver in the midst of the union campaign for fear that it might affect the outcome of the election; and that Kirkpatrick also reported to him in advance concerning the September 17 meeting and later as to what transpired there. Moreover, respondent did not call Kirkpatrick or Knight to refute Srofe's testimony.

## "C. RESPONDENT DISCHARGES PATE.

"Reporting for work on September 22, Pate was told to take out his first load, return, refuel the truck and wait for Terminal Manager Kirkpatrick. When Kirkpatrick arrived, he invited Pate into his office and showed him a letter from Dennis Blalock, respondent's vice-president in charge of safety and personnel. The letter stated that Pate had been involved in four accidents[5] since his employment and

"5. One of the four was an industrial injury rather than a traffic accident and was reported as such by respondent, although referred to at the hearing as a 'traffic injury.' According to respondent, the first accident, which occurred February 18, resulted in $1235 damages

to the Company; the next 2 accidents, both in June, involved damages or expenses of $28 and $27 respectively; and the last one on September 10, involved approximately $100 damages.

that the last of these had not been reported on time, concluding ' * * he should be discharged for failing to report an accident timely and for accident proneness.'

"Pate read the letter and then told Kirkpatrick that he did not believe that he was being discharged for the reasons given, but rather because he was a leader in the Union and that drivers Phillips and Payne had informed against him to Kirkpatrick. Kirkpatrick replied 'I didn't know you had a union. That is news to me.' "

Bearing in mind that at no time did any company representative intimate or express in any manner the company's opposition to the union, much less threaten or attempt to coerce any employee as to union membership, and bearing in mind that there has been no attack on the credibility of the employer witnesses who testified that the uniform custom of the company was for Vice President Blalock to invoke such sanctions as he considered appropriate in connection with maintaining the safety record of the company independent of any labor relations, and further bearing in mind that a District Supervisor of the Bureau of Motor Carriers, Interstate Commerce Commission, testified that Pate's accident record would have caused him, as an examiner, to ask the employer to get rid of the driver, we cannot "conscientiously find that the evidence supporting [the Board's decision] is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."

The petition for enforcement is denied.